**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-3318
_____

JIE FANG; XIAOYU ZHANG;
SHAOFU LI; KAUSHALKUMAR PATEL;
HIRENKUMAR PATEL,
             Appellants

v.

DIRECTOR UNITED STATES IMMIGRATION &
CUSTOMS ENFORCEMENT;
SECRETARY UNITED STATES DEPARTMENT OF
HOMELAND SECURITY;
DIRECTOR UNITED STATES CITIZENSHIP AND
IMMIGRATION SERVICES

Appeal from the United States District Court
for the District of New Jersey
(No. 2-17-cv-02092)
District Judge: Honorable Jose L. Linares
_____

Argued September 25, 2018
_____

Before: McKEE, RESTREPO and FUENTES, *Circuit Judges*.

(Opinion Filed: August 15, 2019)

Ira J. Kurzban [**Argued**]
Kurzban, Kurzban, Tetzeli & Pratt
131 Madeira Avenue
Coral Gables, FL 33134

Thomas E. Moseley

One Gateway Center
Suite 2600
Newark, NJ 07102

*Attorneys for Appellants*

Daniel W. Meyler
Office of United States Attorney
970 Broad Street
Room 700
Newark NJ, 07102

Joshua S. Press **[Argued]**
United States Department of Justice
Office of Immigration Litigation
P.O. Box 868
Ben Franklin Station
Washington, DC 20044

*Attorneys for Appellees*

OPINION OF THE COURT

McKee, Circuit Judge

According to its website, the University of Northern New Jersey "was founded in 2012 after several years of witnessing the challenges inexperienced graduates face in a diverse and global job market."[1] It was purportedly "nationally accredited by the Accrediting Commission of Career Schools and Colleges and the Commission on English Language Accreditation" and "certified by the U.S. Department of Homeland Security, Student and Exchange Visitor Program to educate international students."[2] The site listed the President as Dr. Steven Brunetti, Ph.D., and included a message from Dr.

---

[1] *History of UNNJ,* University of Northern New Jersey, https://web.archive.org
/web/20160312141506/http://www.unnj.edu/history-of-unnj (last visited July 19, 2019).
[2] *Id.*

Brunetti touting the school's dedication "to providing a high-quality American education to the domestic and international academic community."[3] The school's social media accounts even informed students when UNNJ closed for inclement weather and posted wedding pictures after two of the school's alumni were purportedly married.[4]

But the University never existed. Neither did Dr. Brunetti or the newlywed "alumni." The Department of Homeland Security created UNNJ as a "sham university" as part of a scheme to catch brokers of fraudulent student visas. The plan worked, in a manner of speaking. It did catch many brokers of fraudulent student visas. It also ensnared hundreds of foreign students who had "enrolled" in UNNJ. The Government initially conceded that those students were innocent victims of the fraud, but later tried to change that characterization to suggest that they were more akin to participants in the fraudulent scheme.[5] When DHS's investigation into the fraudulent visa scheme concluded, each enrolled student—including the plaintiffs here—received a letter informing them that their student status "ha[d] been set to Terminated due to [their] fraudulent enrollment" in UNNJ.[6] The import of that letter underlies this appeal.

---

[3] *Office of the President*, UNIVERSITY OF NORTHERN NEW JERSEY, https://web.archive.org web/20160307134201/http://www.unnj.edu/office-of-the-president/ (last visited July 19, 2019).

[4] *See, e.g.*, @UNorthernNJ, TWITTER (Feb 2, 2015, 5:45 AM), https://twitter.com/ UNorthernNJ/status/562245302401634304 (last visited July 19, 2019) ("UNNJ will be closed today due to weather. This includes all classes, administrative offices, and clubs/activities. Thank you, Dr. B").

[5] As we explain below, at oral argument the Government conceded that these students were the innocent victims of fraud who had been unknowingly ensnared in the sting set for individuals who profited from such students by charging for arranging fraudulent student visas. Later, for reasons known only to the Government, and as we elaborate below, it contradicted that position by a subsequent statement "clarifying" it.

[6] App. 49.

The Government sent the letter after filing charges against twenty-one individuals for fraudulently procuring visas. The letter terminated the plaintiffs' student visas and the plaintiffs thereafter filed this class action alleging violations of the Administrative Procedure Act, their Due Process rights, and alleging the Government should be estopped from revoking their visas. The District Court dismissed the claims for lack of subject matter jurisdiction, and because no final action had been taken by the Government. The District Court concluded that there was no final Government action because reinstatement proceedings could still provide administrative relief. The Court also found that the case was not ripe for review. We disagree with the District Court's conclusion as to both grounds and will therefore vacate the order dismissing these claims and remand for further proceedings.

## I. BACKGROUND
### A. The F-1 Visa Program

"Nonimmigrant students," such as the plaintiffs, may lawfully obtain an F-1 visa and reside in the United States while enrolled at Government-approved schools.[7] Immigration and Customs Enforcement administers the F-1 visa system, which governs nonimmigrant students' legal status, through its Student and Exchange Visitor Program ("SEVP"). Each school that educates F-1 students has a Designated School Official ("DSO") who monitors, advises, and oversees the students attending his or her institution.[8] When ICE determines that a school's participation in the SEVP should be withdrawn, it provides notice to the school and an opportunity for it to contest the intended termination.[9]

Students who enter the United States with F-1 visas are subject to an array of regulations.[10] These include maintaining a full course of study[11] or participating in an authorized

---

[7] 8 U.S.C. § 1101(a)(15)(F).
[8] *See* 8 C.F.R. § 214.3.
[9] *Id.* § 214.4(b).
[10] *Id.* § 214.2(f).
[11] *Id.* § 214.2(f)(6).

4

"practical training" role following the completion of studies.[12] There are two types of practical training programs.[13] Curricular Practical Training ("CPT") is any "alternative work/study, internship, cooperative education, or any other type of required internship or practicum that is offered by sponsoring employers through cooperative agreements with the school" that is an "integral part of an established curriculum."[14] The other is Optional Practical Training ("OPT") which consists of temporary employment that is "directly related to the student's major area of study."[15]

Once a student has completed his or her course of study and any accompanying practical training, he or she has sixty days to either depart the United States or transfer to another accredited academic institution and seek a transfer of the F-1 visa.[16] If a student voluntarily withdraws from the F-1 program, he or she has fifteen days to leave the United States.[17] A student who "fails to maintain a full course of study without the approval of the DSO or otherwise fails to maintain status" must depart the United States immediately or seek reinstatement.[18]

Under the reinstatement regulations, a district director in the U.S. Citizenship and Immigration Services ("USCIS") "may consider" reinstating a student who demonstrates that he or she: 1) "has not been out of [valid F-1] status for more than 5 months at the time of filing the request for reinstatement" or that "the failure to file within the 5 month period was the result of exceptional circumstances and that the student filed the request for reinstatement as promptly as possible under these exceptional circumstances;" 2) does "not have a record of repeated or willful violations of Service regulations"; 3) is pursuing or intends to pursue a full course of study; 4) has not engaged in unauthorized employment; 5) is not deportable on

---

[12] *Id.* § 214.2(f)(10)(i).
[13] *Id.* § 214.2(f)(10)(ii).
[14] *Id.* § 214.2(f)(1)(i).
[15] *Id.* § 214.2(f)(1)(ii).
[16] *Id.* § 214.2(f)(5)(iv).
[17] *Id.*
[18] *Id.*

any ground other than 8 U.S.C. § 1227(a)(1)(B) and (C)(i);[19] and 6) can prove that the violation of status resulted from circumstances beyond the student's control, or that the violation relates to a reduction in the student's course load that would have otherwise been permitted if authorized by the school and that failure to approve reinstatement would result in extreme hardship to the student.[20] The USCIS's decision to reinstate is discretionary. If the USCIS "does not reinstate the student, the student may not appeal that decision."[21]

Separately, the Code of Federal Regulations permits termination of a student's F-1 visa status in three ways: 1) by revoking a waiver that the Attorney General had previously authorized under § 212(d)(3) or (4) of the Immigration and Nationality Act; 2) "by the introduction of a private bill to confer permanent resident status," or 3) "pursuant to notification in the Federal Register, on the basis of national security, diplomatic, or public safety reasons."[22] Purported "fraudulent enrollment" in an institution is not a statutorily authorized reason for terminating a student's F-1 visa status.[23]

## B.     The "University of Northern New Jersey"

In 2013, ICE created the University of Northern New Jersey and situated it in Cranford, New Jersey.[24] ICE's goal was to target academic recruiters and brokers who charged foreign students a fee to place them into universities that did not actually offer the course of study or authorized practical

---

[19] Section 1227(a)(1)(B) of Title 8 of the U.S. Code classifies an individual as a deportable alien if his or her nonimmigrant visa (such as an F-1 student visa) has been revoked. Section 1227(C)(i) applies to an "alien who was admitted as a nonimmigrant and who has failed to maintain the nonimmigrant status in which the alien was admitted."

[20] 8 C.F.R. § 214.2(f)(16)(i)(A)–(F).

[21] Id. § 214.2(f)(16)(ii).

[22] Id. § 214.1(d).

[23] Nonimmigrant visas may also be revoked at any time at the discretion of a "consular officer or the Secretary of State." 8 U.S.C. § 1201(i). That mechanism of revocation is also inapplicable to this appeal.

[24] Br. for Appellee, 12.

training required to satisfy the F-1 visa requirements. As is apparent from what we said at the outset, for all outward appearances, UNNJ looked like a real university. It was accredited by the State of New Jersey. DHS listed UNNJ on its website of approved institutions. UNNJ maintained a detailed website and active social media accounts. The website outlined admissions criteria, explained the academic programs that the school offered (including seven undergraduate majors and nine graduate programs), and assured students that various support systems including tutoring sessions and advisory services were available.[25]

By the time UNNJ "closed" in April of 2016, DHS's sting operation yielded twenty-two arrests relating to the brokerage of fraudulent visas. At that same time, more than 500 students had ostensibly "enrolled" in UNNJ. The closure of the university prompted DHS to inform those students that their valid F-1 status had been terminated. DHS did so in a letter sent to students that stated, in relevant part:

> This letter is to inform you that your SEVIS record and your Form I-20, SEVIS [Identification Number], issued by University of Northern New Jersey, school code NEW214F32011000, has been set to Terminated status ***due to your***

---

[25] UNNJ's website also included multiple appeals to international students. For example, its "History" page noted explicitly that it was certified by DHS to "educate international students." *History of UNNJ,* UNIVERSITY OF NORTHERN NEW JERSEY, https://web.archive .org/web/20160312141506/http://www.unnj.edu/history-of-unnj (last visited July 19, 2019). Its admissions page stated that incoming students would "meet countless other students from around the world" and included special instructions for "[i]nternational applicants seeking F-1 visa status." *Admissions,* UNIVERSITY OF NORTHERN NEW JERSEY, https://web.archive.org/web/20160326211937/http://www.un nj.edu/admissions (last visited July 19, 2019). Indeed, the only thing lacking appears to be reference to UNNJ's men's or women's basketball team in the Final Four of the National Collegiate Athletic Association's basketball tournament.

*fraudulent enrollment in the above school.*

Since your SEVIS record has been Terminated you no longer have valid F-1 nonimmigrant status and must either file for reinstatement of your nonimmigrant student status with U.S. Citizenship and Immigration Services (USCIS) or depart the United States immediately.

For instructions on how to file for a reinstatement, visit www.uscis.gov. Transfer requests will not be authorized unless you have been approved for reinstatement by USCIS.[26]

## C.     The Student Plaintiffs and The Current Litigation

The named plaintiffs are five students whose visas were cancelled following the closure of UNNJ. They filed the putative class action complaint that gave rise to this appeal on behalf of themselves and hundreds of other similarly situated students.[27] The complaint 1) alleged that the Government's termination of their lawful immigration status was a violation of Due Process and was arbitrary and capricious under the Administrative Procedure Act,[28] and 2) sought an order prohibiting the Government from finding that the students committed fraud by enrolling in UNNJ.

The Government moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction. It argued that ICE's determination did not qualify as a final agency action and that the case was not ripe for review. The

---

[26] App. 49 (emphasis added).

[27] We take no position on whether this suit will ultimately be amenable to class disposition.

[28] 5 U.S.C. § 551 *et seq.*

8

District Court granted the motion on both grounds.[29] It first concluded that ICE's decision to terminate the students' F-1 status was not a final agency action "because their applications for reinstatement [were] still pending."[30] It explained that the "initial decision of terminating Plaintiffs' visas cannot be seen as 'final' given that ICE is currently in the process of deciding if Plaintiffs are entitled to reinstatement of their visas."[31] It found that the termination decision was "more akin to the beginning of an administrative proceeding than enacting a final action."[32]

Second, the District Court concluded that the issues were not ripe for review because the students were "seeking the same determination—whether their enrollments were fraudulent—that they [were] already seeking from their pending applications."[33] It also found that the record was incomplete because of ongoing ICE proceedings, and that "immediate hardship cannot be shown because the administrative proceeding will likely be resolved in the coming months without any action needed from this Court."[34]

The District Court entered an order dismissing the case. This appeal followed. At the time of the appeal, the named plaintiffs' immigration statuses were as follows:

- Plaintiff Jie Fang appeared before an immigration court, which issued a voluntary departure order on March 8, 2017. He departed the United States on March 31, 2017 and had not yet applied for reinstatement.

- Plaintiff Shaofu Li was placed in removal proceedings but subsequently departed the United States on April 4, 2017, resulting in the termination of his removal proceedings in June 2017. He also applied for reinstatement to attend the Harrisburg University of Science & Technology, but that application was denied

---

[29] *Fang v. Homan*, No. 17-2092, 2017 WL 6453466 (E.D. Pa. Oct. 2, 2017).

[30] *Id.* at *2.

[31] *Id.*

[32] *Id.*

[33] *Id.* at *3.

[34] *Id.*

9

by USCIS because, among other reasons, he failed to respond to USCIS's request for evidence.

- Plaintiff Hirenkumar Patel applied for reinstatement to attend the Harrisburg University of Science & Technology, and that application was denied by USCIS in January 2018 because, in his reinstatement filing, he "asserted that [he] began attending online classes at UNNJ in June 2015." Because "UNNJ conducted no courses of study, held no classes of any kind, and required no coursework of its students" his "statement to the contrary constitute[d] a willful misrepresentation of material fact in pursuit of an immigration benefit," which USCIS considered "a very serious factor which weighs against a favorable exercise of discretion." H. Patel was placed in removal proceedings and had a hearing scheduled in the Newark immigration court in January 2019.

- Plaintiff Kaushalkumar Patel applied for reinstatement to attend the Harrisburg University of Science & Technology and that application was denied by USCIS in December 2017 because, in his reinstatement filing, he "asserted that [he] began attending online classes at UNNJ in June 2015." Because "UNNJ conducted no courses of study, held no classes of any kind, and required no coursework of its students" his "statement to the contrary constitute[d] a willful misrepresentation of material fact in pursuit of an immigration benefit," which USCIS considered "a very serious factor which weighs against a favorable exercise of discretion." Patel was placed in removal proceedings and had a hearing scheduled in the Philadelphia immigration court in October 2018.

- Plaintiff Xiaoyu Zhang applied for reinstatement to attend the University of North Texas. That application was still pending before USCIS.

**D.     "These students, as far as we are concerned, were the victims of fraud."**

10

We held argument on September 25, 2018. There, for the first time, the Government informed this Court that its position was not that the students had committed fraud by enrolling in UNNJ. Rather, the Government believed that the students were the *victims* of fraud. The Government twice stated that the students "were caught up in it in the sense that they were victim by the academic recruiters" [35] and that "[t]here was no fraud here. These students, as far as we are concerned, were the victims of fraud. . . . [T]hey were caught up in it."[36] When pressed about the language in the terminating letter, the Government (incorrectly) stated that "fraudulent enrollment" was "passive voice,"[37] and therefore should not be read to imply that the students had committed fraud.

Despite the Government's position that the students were the victims of fraud, it acknowledged that database entries for each student would reflect the "fraudulent enrollment" determination made by DHS. The Government acknowledged that it was able to, consistent with its stated position, eliminate any database notations that suggested that the students had committed fraud, yet it refused to do so.[38] It argued that correcting the record on a preventive basis was not necessary because the "fraudulent enrollment" determination would not have any adverse impact on the students in future immigration proceedings.[39]

On October 12, 2018, the Government changed course yet again. It filed a letter "to clear up any confusion from certain exchanges" that occurred during argument. The Government informed the Court that it was not, in fact, conceding "that all—or even most—UNNJ enrollees were innocent victims."[40] In fact, the Government now asserted that some of the students "in all likelihood, knew that their academic recruiters were committing visa fraud" and others even "conspired with their academic recruiters to commit visa

---

[35] Oral Arg. Tr., 23.

[36] *Id.* at 21.

[37] *Id.* at 25.

[38] *Id.* at 26, 28–29.

[39] *Id.* at 36.

[40] Letter, 1, Oct. 12, 2018.

fraud."[41] "Thus," the letter concluded, "to the extent that any of the Government's comments at oral argument left the misimpression that all of UNNJ's enrollees were innocent victims of the academic recruiters' visa fraud scheme, that is not the case."[42]

## I. DISCUSSION[43]

## A. Jurisdiction Under the Administrative Procedures Act

Under the APA, "final agency action[s] for which there is no other adequate remedy in a court are subject to judicial review."[44] For an agency action to be final under the APA, the action must mark the "consummation" of the agency's decision-making process, and the action must determine a "right[] or obligation[]."[45] Here, the second condition is clearly satisfied. The termination order ended the student's legal status in the United States. However, the question of whether the action also marked the consummation of the agency's decisionmaking process is not as clear.

The appellants argue the termination of their status constituted a final order because ICE's decisionmaking process

---

[41] *Id.* at 2.

[42] *Id.*

[43] We have jurisdiction pursuant to 28 U.S.C. § 1291. Although the District Court dismissed the case without prejudice, the appellants have stated that they cannot amend their complaint in order to cure the defect. Accordingly, the dismissal order is final. *See Palakovic v. Wetzel*, 854 F.3d 209, 219 (3d Cir. 2017) ("Although we generally do not exercise jurisdiction where a District Court dismisses a complaint without prejudice and grants leave to amend, such an order is final and reviewable under § 1291 where, as here, a party declares an intention to stand on the complaint.") (internal citations omitted). Our standard of review for appeals challenging a district court's decision about jurisdiction and ripeness is plenary. *Marathon Petroleum Corp. v. Sec'y of Finance*, 876 F.3d 481, 488 n.9 (3d Cir. 2017)

[44] 5 U.S.C. § 704.

[45] *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted).

is now complete. Their lawful F-1 student status has been stripped away from them and ICE has already determined that they fraudulently enrolled in UNNJ to obtain visas.[46] The Government counters that the action is not final because the appellants have "avenues of recourse other than a lawsuit in federal court."[47] According to the Government, appellants can pursue either of two administrative avenues of relief. First, the Government claims the UNNJ students may seek reinstatement pursuant to 8 C.F.R. § 214.2(f)(16). Second, it claims that an adverse reinstatement decision can be addressed during removal proceedings, which give the appellants the "opportunity to contest the grounds of their removal before an immigration judge ('IJ'), with the opportunity to appeal any adverse decisions to the Board of Immigration Appeals ('BIA'), and from there to a court of appeals."[48] The District Court agreed with the Government's first argument. The Court held that the order was not final because reinstatement proceedings were pending. It did not address the argument about deportation proceedings.

Finality in immigration proceedings is governed by our decision in *Pinho v. Gonzales*.[49] There, Gummersindo Pinho, a native of Portugal who married a United States citizen, applied for an adjustment of his immigration status to "permanent resident."[50] The Immigration and Naturalization Service denied adjustment based on an eight-year-old narcotics conviction that had been vacated about two years prior to Pinho's adjustment application. Pinho then filed a complaint in district court seeking a declaratory judgment that the denial of his adjustment of status was arbitrary, capricious, and unlawful because his previously vacated conviction should not have barred his eligibility for adjustment.[51] The district court granted summary judgment in favor of the Government for reasons that are not relevant to our inquiry.

---

[46] Br. for Appellant, 26–27.

[47] Br. for Appellees, 4.

[48] *Id.*

[49] 432 F.3d 193 (3d Cir. 2005).

[50] *Pinho*, 432 F.3d at 197.

[51] *Id.* at 198.

On appeal, we considered *sua sponte* whether the INS's decision, which was ultimately affirmed by ICE's Administrative Appeals Office ("AAO") constituted a final order for the purposes of APA jurisdiction. We began our discussion by reciting the *Bennett* test set forth above. We then noted that "[f]inality requires exhaustion of administrative remedies."[52] That is, if "there remain steps that the immigrant can take to have an action reviewed within the agency, then the action is not final and judicial review is premature."[53] We explained that this rule is derived from the Supreme Court's decision in *Darby v. Cisneros*.[54] There, the Court "held that agency action is final when the 'aggrieved party has exhausted all administrative remedies expressly prescribed by statute or agency rule.'"[55] However, the Court limited the instances where an aggrieved litigant must appeal to "superior agency authority" before proceeding in federal court.[56] The Court held that exhaustion of administrative remedies was "a prerequisite to judicial review *only* when expressly required by statute or when an administrative rule requires appeal before review and the administrative action is made inoperative pending that review."[57]

In Pinho's case, we concluded that the AAO's denial of his adjustment of status was a final order because "the agency offered no further procedures that Pinho could invoke to have his claim of statutory eligibility heard. There [was] no provision for BIA review of an AAO status-adjustment eligibility decision."[58] Put differently, "Pinho had no further opportunity to challenge the legality of the decision within the agency."[59] We also found that the possibility for Pinho to renew his application for change of status during deportation proceedings did not affect the finality of the agency's actions. "The reason [was] simple: if the agency does not seek to deport

---

[52] *Id.* at 200.

[53] *Id.*

[54] 509 U.S. 137 (1993).

[55] *Pinho*, 432 F.3d at 202 (quoting *Darby*, 509 U.S. at 146).

[56] *Id.* (quoting *Darby*, 509 U.S. at 154).

[57] *Id.* (quoting *Darby*, 509 U.S. at 154).

[58] *Id.* at 200.

[59] *Id.* at 201.

the immigrant, there can never be an appeal within the agency by which any higher level of administrative authority can be invoked to review the legal determination made by the AAO."[60]

*Pinho's* holding is straightforward. A litigant aggrieved by an agency decision must seek review from a superior agency authority before bringing a claim in the district court "*only* when expressly required [to do so] by statute"[61] and only when the statute sets forth "steps that the immigrant can take to have an action reviewed within the agency."[62] Thus, removal proceedings are not a prerequisite to finality when there is no guarantee that such a proceeding will ever occur.

Following *Pinho*, the Courts of Appeals for the Sixth and Ninth Circuits expounded further on the concept of finality for the purposes of APA jurisdiction in the adjustment-of-status context.[63] In *Cabaccang v. USCIS*, the Court of Appeals for the Ninth Circuit considered whether a denial of status adjustment constituted a final order. However, unlike in *Pinho*, Cabaccang faced pending removal proceedings when his adjustment of status was denied. The court concluded that the denial of status adjustment was not final because the immigration judge overseeing the pending removal proceedings had the power to "completely wipe away [the] USCIS's prior decision" to deny Cabaccang's adjustment-of-status request.[64] The removal proceedings empowered the immigration judge to exercise *de novo* review over applications for adjustment of status.[65]

In *Hosseini v. Johnson*, the Court of Appeals for the Sixth Circuit adopted our reasoning in *Pinho*.[66] In doing so, it

---

[60] *Id.*

[61] *Id.* at 202.

[62] *Id.* at 200.

[63] *See Hosseini v. Johnson*, 826 F.3d 354 (6th Cir. 2016); *Cabaccang v. USCIS*, 627 F.3d 1313 (9th Cir. 2010).

[64] *Cabaccang*, 627 F.3d at 1316.

[65] *Id.* (citing 8 C.F.R. §§ 1240.1(a)(1)(ii), 1245.2(a)(1)(i)).

[66] *See Hosseini*, 826 F.3d at 361 (finding *Pinho* "particularly instructive").

rejected the Government's argument that the applicant, who was denied adjustment of status, could "merely reapply for admission as often as he wants."[67] The Sixth Circuit held that the Government's position that Hosseini could "simply 'try again' fails to appreciate that even if [he] receive[d] four or five denials, he would never receive meaningful review of any of them."[68] That is, there could "never be an appeal within the agency by which any higher level of administrative authority [could] be invoked to review the legal determination" made by the USCIS.[69] The same is true here.

The order terminating these students' F-1 visas marked the consummation of the agency's decisionmaking process, and is therefore a final order, for two reasons. First, there is no statutory or regulatory requirement that a student seek reinstatement after his or her F-1 visa has been terminated. Moreover, even if the students attempt to pursue the administrative procedures for reinstatement, there is no mechanism to review the propriety of the original termination order. Second, the students need not wait for removal proceedings to be instituted. As we stated in *Pinho*, an order's finality cannot depend on the institution of removal procedures which may never occur. And in any event, immigration judges cannot review the original denial of reinstatement. They do not have that authority. We explain each aspect of our holding in turn.

First, we disagree with the District Court's conclusion that the order is not final because the students are either seeking reinstatement or could seek reinstatement in the future. Nothing in the Immigration and Nationality Act[70] or the Code of Federal Regulations requires a nonimmigrant whose visa has been terminated to seek reinstatement as a form of review.[71] The reinstatement regulation itself notes only that a student "may not appeal" an unsuccessful attempt at

---

[67] *Id.* at 362.

[68] *Id.*

[69] *Id.* at 361 (quoting *Pinho*, 432 F.3d at 201).

[70] 8 U.S.C. § 1101 *et seq.*

[71] 8 C.F.R. § 214.1(d).

reinstatement.[72] In short, reinstatement is not "a prerequisite to judicial review."[73] It is neither "expressly required by statute" nor does "an[y] administrative rule require[] appeal before review and the administrative action is made inoperative pending that review."[74]

We similarly hold that reinstatement proceedings are not a prerequisite to finality because reinstatement is not a mechanism by which the students can obtain review of DHS's decision to terminate their status for their alleged fraudulent enrollment.[75] Despite the Government's argument to the contrary, there is nothing in the reinstatement provisions that permit the USCIS to review a prior termination order issued by DHS. Rather, the former UNNJ students will first need to reenroll in another school[76] and then demonstrate that they satisfy the remaining criteria for reinstatement.[77] Even if the students are successfully reinstated by USCIS, they will have achieved that status without ever having undergone review of the initial termination and fraudulent enrollment decision. Accordingly, reinstatement does not provide an opportunity to "completely wipe away" a prior agency decision.[78] Nor does it provide a step that "the immigrant can take to have an action reviewed within the agency."[79]

We also disagree with the District Court's conclusion that terminating the students' status was akin to "an initial administrative action that begins an investigation," and therefore was not final.[80] The Government relies on this

---

[72] *Id.* § 214.2(f)(16)(ii).

[73] *Pinho*, 432 F.3d at 202 (quoting *Darby*, 509 U.S. at 154).

[74] *Id.*

[75] Given the Government's vacillation on the issue, we take no position on whether the students fraudulently enrolled in UNNJ.

[76] *See* 8 C.F.R. § 214.2(f)(16)(i) (requiring a "DSO's recommendation for reinstatement").

[77] *Id.* § 214.2(f)(16)(i)(A)-(F).

[78] *Cabaccang*, 627 F.3d at 1316.

[79] *Pinho*, 432 F.3d at 200.

[80] *Fang*, 2017 WL 6453466, at *2 (citing *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 239 (1980)).

position on appeal, and attempts to analogize this situation to cases involving, for example, termination of asylum.[81] The asylum cancellation statutes illustrate why the termination in this case is final as opposed to the "termination of asylum [which] does not consummate agency action and thus is not final."[82]

When the Government terminates asylum status, it must necessarily initiate removal proceedings.[83] During those proceedings, the former asylee may contest the termination in front of an immigration judge and/or reapply for asylum.[84] The provisions regarding termination of F-1 status contain no such analogous requirement that the Government initiate removal proceedings. Indeed, as the Government concedes, some of the plaintiffs here have yet to have removal proceedings initiated against them even after their F-1 status had been set to "terminated." Unlike the situation with asylees, each student's status was terminated without any proceedings ever being initiated. That clearly distinguishes the students' procedural path from that of an ex-asylee. Accordingly, we hold that the termination of the students' F-1 visa status in the manner that occurred here is not akin to the initiation of the agency's decisionmaking process. Rather, it is the culmination of that process.

Second, we disagree with the Government's contention that the agency's action is not final because the students can obtain review of any denial of reinstatement during removal proceedings. This argument fails for two reasons. First, as we stated in *Pinho*, the finality of an order cannot be conditioned on something that may never happen. Accordingly, as we held in *Pinho*, uninitiated removal proceedings cannot be a prerequisite to finality when there is no guarantee that such proceedings will ever occur. Moreover, we do not agree with

---

[81] *See* Br. for Appellee, 23–24.

[82] *Qureshi v. Holder*, 663 F.3d 778, 779 (5th Cir. 2011).

[83] *See* 8 C.F.R. § 208.14(c)(1) ("[I]n the case of an [asylum] applicant who appears to be . . . deportable . . . the asylum officer shall refer the application to an immigration judge . . . for adjudication in removal proceedings[.]"); *see also, generally, Kashani v. Nelson*, 793 F.2d 818 (7th Cir. 1986).

[84] *Qureshi*, 663 F.3d at 780.

any suggestion that a student is not really harmed if no removal proceedings ever occur. We therefore reject any such claim as bearing on our finality inquiry. It is highly unlikely that any student will simply be allowed to remain here. Moreover, even if that were to happen, we do not think that any such students should be forced to permanently endure remaining here with the threat of imminent removal and all of its attendant circumstances permanently hanging over their heads.

Second, removal proceedings do not offer an opportunity for review of the denial of reinstatement. Although we have never addressed the issue precedentially,[85] both the BIA[86] and our sister circuit courts of appeals[87] have held that removal proceedings cannot function as review mechanisms for reinstatement proceedings.

In *Young Dong Kim v. Holder*, a nonimmigrant student's F-1 status was terminated and the USCIS denied the petition to reinstate.[88] Eventually, DHS issued a Notice to Appear and initiated deportation proceedings.[89] When Ko (the former F-1 visa holder) attempted to challenge the denial of reinstatement the IJ "noted that he lacked the authority to reinstate Ko's student status because the decision was within the sole discretion of the USCIS."[90] On administrative appeal, the BIA also found "that neither the IJ nor the BIA have the authority to review the decision by USCIS denying Ko's application to reinstate her student status."[91] When Ko eventually appealed to the Court of Appeals for the Seventh Circuit, that court held that the IJ and the BIA may not "review

---

[85] *See Laoye v. Attorney General*, 352 F. App'x 714, 717 (3d Cir. 2009) (per curiam).

[86] *See, e.g.*, *Matter of Yazdani*, 17 I.&N. Dec. 626, 628–29 (BIA 1981).

[87] *See, e.g.*, *Young Dong Kim v. Holder*, 737 F.3d 1181 (7th Cir. 2013); *Ghorbani v. INS*, 686 F.2d 784, 791 (9th Cir. 1982); *Tooloee v. INS*, 722 F.2d 1434, 1436 (9th Cir. 1983).

[88] *Kim*, 737 F.3d at 1182.

[89] *Id.*

[90] *Id.* at 1183.

[91] *Id.* at 1184.

the USCIS's discretionary denial of a motion to reinstate student status."[92]

Similarly, in *Tooloee v. INS*, both an immigration judge and the BIA refused to reexamine the USCIS District Director's decision to deny Tooloee's request for reinstatement.[93] The IJ found that it was without authority to review the claim,[94] and the BIA agreed. On appeal, the Court of Appeals for the Ninth Circuit held that "the immigration judge and the BIA, in refusing to review the District Director's decision, correctly interpreted their jurisdictional regulations."[95] *Tooloee* noted that the agency regulations explicitly stated that there shall be no appeal from the District Director's decision, and it was therefore not unreasonable for another agency to find that it had no authority to re-examine the District Director's decision.[96]

We therefore hold that removal proceedings cannot serve as an opportunity to review the USCIS's denial of reinstatement because neither immigration judges nor the BIA have jurisdiction to review those decisions. Our decision is dictated by the Code of Federal Regulations,[97] and is consistent with decisions of the BIA[98] and our sister circuit courts of appeals.[99] We therefore reject the Government's argument that the order terminating the appellants' student status in this case is not final until after removal proceedings are instituted—a process which the Government contends must itself occur (if at all) only after denial of reinstatement.

---

[92] *Id.* at 1187.

[93] *Tooloee,* 722 F.2d at 1436.

[94] *Id.*

[95] *Id.*

[96] *Id.*

[97] 8 C.F.R. § 214.2(f)(16)(ii) (stating that "if the USCIS does not reinstate the student, the student may not appeal its decision").

[98] *Matter of Yazdani*, 17 I.&N. Dec. 626, 628–29 (BIA 1981).

[99] *Young Dong Kim v. Holder*, 737 F.3d 1181 (7th Cir. 2013); *Ghorbani v.* INS, 686 F.2d 784, 791 (9th Cir. 1982); *Tooloee v. INS*, 722 F.2d 1434, 1436 (9th Cir. 1983).

In sum, we hold that reinstatement proceedings neither are required by statute or regulation nor afford the students an opportunity for review of DHS's decision to terminate their F-1 visa status and therefore are not a prerequisite to finality for the purposes of our subject matter jurisdiction under the APA. Similarly, the students need not wait until removal proceedings are instituted to challenge the termination of their student status. Since neither immigration judges nor the BIA have the authority to overturn the USCIS's denial of reinstatement, those proceedings do not offer the students an opportunity to contest agency action. The order terminating the students' F-1 visa status was therefore a final order for jurisdictional purposes because there was no further opportunity for review.[100]

## B. Ripeness

We also disagree with the District Court's conclusion that this case is not ripe for review. Ripeness is a justiciability doctrine that derives from Article III of the United States Constitution.[101] "The function of the ripeness doctrine is to determine whether a party has brought an action prematurely[.]"[102] The doctrine counsels that we should abstain "until such time as a dispute is sufficiently concrete to

---

[100] And it is easy to see why the students desire review—DHS appears to have terminated their F-1 visas without the statutory authority to do so. As discussed above, the ability to terminate an F-1 visa is limited by § 214.1(d). That provision states: "(d) Termination of status. Within the period of initial admission or extension of stay, the nonimmigrant status of an alien shall be terminated by the revocation of a waiver authorized on his or her behalf under section 212(d)(3) or (4) of the Act; by the introduction of a private bill to confer permanent resident status on such alien; or, pursuant to notification in the Federal Register, on the basis of national security, diplomatic, or public safety reasons." 8 C.F.R. § 214.1(d). None of those mechanisms were employed in this case.

[101] *Felmeister v. Office of Attorney Ethics*, 856 F.2d 529, 535 (3d Cir. 1988).

[102] *Peachlum v. City of York*, 333 F.3d 429, 433 (3d Cir. 2003) (citations omitted).

21

satisfy the constitutional and prudential requirements of the doctrine."[103] We have recognized the following considerations that underpin the ripeness doctrine:

> [A]re the parties in a sufficiently adversarial posture to be able to present their positions vigorously; are the facts of the case sufficiently developed to provide the court with enough information on which to decide the matter conclusively; and is a party genuinely aggrieved so as to avoid expenditure of judicial resources on matters which have caused harm to no one.[104]

At bottom, the doctrine is inextricably tied to Article III's requirement of a case or controversy. It "requires that the challenge grow out of a 'real, substantial controversy between parties' involving a 'dispute definite and concrete.'"[105]

As previously discussed, the District Court found that ongoing reinstatement proceedings rendered this case unripe for review, "because Plaintiffs are seeking the same determination—whether their enrollments were fraudulent—that they are already seeking from their pending [reinstatement] applications."[106] But, as we have just explained, the ongoing reinstatement proceedings do not provide an avenue to review ICE's termination of the students' F-1 visa status. Given that procedural conundrum, the posture of this case satisfies all of the traditional factors that we have considered in a ripeness analysis.

The parties are clearly sufficiently adversarial. The students are genuinely aggrieved after having their lawful status terminated and a notation of fraud placed on their

---

[103] *Id.*

[104] *Id.* at 433–34 (citing Erwin Chemerinsky, Federal Jurisdiction § 2.3.1 (1989)).

[105] *Id.* at 434 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

[106] *See Fang*, 2017 WL 6453466, at *3.

records, thereby permanently branding each of them with a Scarlett "F."  The only consideration that could arguably give us pause is the Government's shifting position on whether the students are the victims of fraud or themselves participants in the fraud for having come here to attend the nonexistent UNNJ. However, it would be a cruel irony indeed if we were to allow the Government's own flip-flop on that characterization to deprive us of the ability to review the disputed governmental action, an action which, as we have explained, will almost certainly escape review absent an exercise of Article III jurisdiction.  Rather than allow the Government's change in position to inure to the Government's own benefit, we believe the flip-flop underscores the need for judicial review of a decision that would otherwise escape review by any court or agency.

There may ultimately be issues that arise here as the record develops that weigh in favor of proceeding cautiously. For example, there will likely be a formidable challenge to this case's amenability for class disposition because even the named plaintiffs appear to be in starkly different positions. But none of those issues will become more crystallized at a later date, absent an opportunity develop the record and none of the collateral challenges will result in review of ICE's decision to terminate the students' status for purportedly fraudulent enrollment.  We therefore hold that this case, as currently comprised, is ripe for review and will remand to the District Court so that this record can be developed.[107]

## II.  CONCLUSION

For the foregoing reasons, the order dismissing this case is reversed and the case is remanded to the District Court for proceedings consistent with this opinion.

---

[107] Although we have commented on potential issues surrounding the composition of this class, we take no position on the propriety of pursing these claims as a class action. We have alluded to theoretical issues of class certification merely in the context of our discussion of the ripeness doctrine and nothing we have said herein should be taken as controlling or influencing the District Court in any subsequent inquiry under Rule 23.